

U.S. Department of Justice

*Joshua S. Levy*
*Acting United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*                 *John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

September 14, 2023

Leonard E. Milligan III, Esq.
28 State Street, Suite 802
Boston, MA 02109-1719

    Re:    United States v. Daphne Jenkins
             Criminal No. 23-cr- 10265

Dear Attorney Milligan:

The Acting United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Daphne Jenkins ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

    1.    Change of Plea

Defendant will waive Indictment and plead guilty to count 1 of the Information: conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. Defendant admits that Defendant committed the crime specified in this count and is in fact guilty.

Defendant agrees to the accuracy of the attached statement of facts.

    2.    Penalties

Defendant faces the following maximum penalties: incarceration for ten years; supervised release for three years; a fine of $250,000 or twice the gross pecuniary gain or loss, whichever is greater; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Information.

    3.    Sentencing Guidelines

The parties agree, based on the following calculations, that Defendant's total "offense level" under the current Guidelines is 25:

   a) Defendant's base offense level is 6 because the offense has a statutory maximum term of imprisonment of less than 20 years (USSG § 2B1.1(a)(2));

   b) Defendant's offense level is increased by 18 because Defendant's intended loss was more than $3,500,000 and less than $9,500,000 (USSG § 2B1.1(b)(1)(J));

   c) Defendant's offense level is increased by 2 because Defendant's offense is a Federal health care offense involving a Government health care program and the loss was more than $1 million (USSG § 2B1.1(b)(7)(B)(i));

   d) Defendant's offense level is increased by 2 because the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense (USSG § 3B1.3); and

   e) Defendant's offense level is decreased by 3 because Defendant has accepted responsibility for Defendant's crime (USSG § 3E1.1).

If (a) the proposed United States Sentencing Guideline 4C1.1 (Adjustment for Certain Zero-Point Offenders) ("Proposed Guideline 4C1.1") becomes effective prior to Defendant's sentencing hearing; (b) U.S. Probation determines that Defendant does not receive any criminal history points, and (c) the United States determines that Defendant otherwise meets the criteria in Proposed Guideline 4C1.1, the United States will recommend that Defendant's offense level be reduced by two levels pursuant to 4C1.1. If proposed guideline 4C1.1 is not yet effective at the time of Defendant's sentencing, but above criteria (b) and (c) are met, the United States will recommend that the Defendant receive a two-level downward variance pursuant to 18 U.S.C. § 3553(a). In exchange for the variance recommendation, Defendant agrees to not seek a further reduced sentence based on Proposed Guideline 4C1.1 when it becomes effective.

Defendant understands that the Court is not required to follow this calculation or even to sentence Defendant within the Guidelines and that Defendant may not withdraw Defendant's guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the government will object to any reduction in Defendant's sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crime to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4.    Sentence Recommendation

The U.S. Attorney agrees to recommend the following sentence to the Court:

a) incarceration within the range of 34 to 43 months;

b) a fine within the Guidelines sentencing range as calculated by the parties in Paragraph 3, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

c) 12 months of supervised release;

d) a mandatory special assessment of $100, which Defendant must pay to the Clerk of the Court by the date of sentencing;

e) restitution of $3,952,791.61; and

f) forfeiture as set forth in Paragraph 6.

Based on the factors set forth in 18 U.S.C. § 3553(a), Defendant is free to recommend whatever sentence she deems appropriate as to incarceration, fine, and supervised release. Defendant agrees with the U.S. Attorney's recommendation of the mandatory special assessment, restitution, and forfeiture.

Defendant agrees that all criminal monetary penalties, including special assessment, restitution, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

5.    Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

a) Defendant will not challenge Defendant's <u>conviction</u> on direct appeal or in any

other proceeding, including in a separate civil lawsuit; and

b) Defendant will not challenge Defendant's <u>sentence,</u> including any court orders related to forfeiture, restitution, fines or supervised release, on direct appeal or in any other proceeding, including in a separate civil lawsuit.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence will be final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence, regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6. <u>Forfeiture</u>

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a. $44,020.00 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $44,020.00 is subject to forfeiture on the grounds that it is equal to the amount of proceeds the defendant derived from the offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds the Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the

value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about the Defendant with the United States Attorney's Office.

Defendant also agrees to waive all constitutional, legal, and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement.

Defendant hereby waives and releases any claims Defendant may have to any vehicles, currency, or other personal property seized by the United States, or seized by any state or local law enforcement agency and turned over to the United States, during the investigation and prosecution of this case, and consents to the forfeiture of all such assets.

7. <u>Civil Liability</u>

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

8. <u>Breach of Plea Agreement</u>

Defendant understands that if Defendant breaches any provision of this Agreement, violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

  Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

  9. <u>Who is Bound by Plea Agreement</u>

  This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

  10. <u>Modifications to Plea Agreement</u>

  This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

* * *

  If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Howard Locker.

  Sincerely,

  JOSHUA S. LEVY
  Acting United States Attorney

By: _____
  KELLY BEGG LAWRENCE
  Chief, Health Care Fraud Unit
  PATRICK CALLAHAN
  Deputy Chief, Health Care Fraud Unit

  _____
  Alexandra Brazier
  Lauren Graber
  Howard Locker
  Lindsey Ross
  Assistant U.S. Attorneys

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crime I am pleading guilty to, and the maximum penalties for that crime. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charge against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offense. I believe this Agreement is in my best interest.

_____
Daphne Jenkins
Defendant

Date: 9-29-2023

I certify that Daphne Jenkins has read this Agreement and that we have discussed what it means. I believe Daphne Jenkins understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
Leonard E. Milligan III, Esq.
Attorney for Defendant

Date: 9/29/2023

7

## STATEMENT OF FACTS

From in or around December 2018 through in or around April 2020, in Essex and Middlesex Counties, the District of Massachusetts, and elsewhere, the defendant, DAPHNE JENKINS ("JENKINS"), knowingly and willfully conspired and agreed with her co-conspirators to commit health care fraud, in violation of Title 18, United States Code, Section 1349, that is (a) to knowingly and willingly execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347. Medicare was a "health care benefit program" as defined in Title 18, United States Code, Section 24. Further, Medicare was a health care benefit program affecting commerce.

JENKINS, a resident of Woodbridge, Virginia, was a nurse practitioner licensed in Virginia, the District of Columbia, West Virginia, and Maryland. In 2018, she worked with a Massachusetts-based medical staffing company ("Staffing Company") to find placements with telemedicine companies. Around December 2018, Staffing Company presented JENKINS with a placement at a Florida-based telemedicine company ("Telemedicine Company"), owned by an individual who lived in the Middle District of Florida ("Telemedicine Company Owner").

Between in or around December 2018 through in or around April 2020, JENKINS entered into an agreement with Telemedicine Company Owner whereby Telemedicine Company Owner sent medical records and orders for durable medical equipment ("DME"), principally off-the-shelf orthotic braces, electronically to JENKINS for her to review and sign. These records contained

1

statements that JENKINS knew to be false, including statements that indicated that JENKINS conducted an examination of the beneficiary, that JENKINS had a provider-patient relationship with the beneficiary, and that JENKINS actually reviewed the records and orders and exercised medical judgment in reviewing and signing the orders.

However, JENKINS had been informed by representatives of Staffing Company and Telemedicine Company Owner that she only had to review and sign these orders without any beneficiary contact. In addition, JENKINS generally signed the Telemedicine Company's records and orders without even reading them. JENKINS knew this was not an appropriate way to practice medicine.

Through JENKINS' experience and knowledge of her responsibilities as a nurse practitioner, JENKINS knew that medical records had to be accurate, and thus she could not sign the records and orders from Telemedicine Company. Moreover, based on her prior experience treating individuals for joint pain, she knew that the information in the records and orders provided by Telemedicine Company were inadequate and insufficient to order DME, and thus the orders she signed were medically unnecessary.

For approving each order, JENKINS received approximately $20 from Staffing Company. JENKINS understood that the Staffing Company paid her out of funds the Staffing Company received from Telemedicine Company. The Staffing Company was based in Massachusetts and payments from the Staffing Company came from a bank account in the District of Massachusetts held in the name of the Staffing Company. For example, on or about April 12, 2019, JENKINS received a transfer of approximately $1,940 in her Navy Federal Credit Union account ending in x3973 that originated from the Massachusetts-based bank account held by the Staffing Company. In total, JENKINS received $44,020 for the DME orders she signed for Telemedicine Company.

Finally, JENKINS was aware that the beneficiaries whose information was on the orders she signed were Medicare beneficiaries and that the DME she ordered would be covered in whole or in part by Medicare.

For example, on or about December 11, 2018, JENKINS received a packet of medical records and orders for multiple orthotic braces for at least one beneficiary. The packet, sent via DocuSign, was 16 pages long and contained 12 places where JENKINS could sign if she approved every order. In fact, she approved every order. The time that elapsed between when JENKINS first viewed and completed signing the orders and records was approximately 32 seconds. JENKINS could not, and did not, exercise any medical judgment in signing these orders. Included in this order were bilateral ankle braces, a left wrist, and right shoulder brace for beneficiary TT. Medicare was billed approximately $2,542.67 for these items and paid approximately $1,567.67.

As another example, on or about January 8, 2020, JENKINS received a packet of medical records and orders for multiple orthotic braces for approximately seven beneficiaries. The packet, sent via DocuSign, was 37 pages long and contained 24 places where JENKINS could sign if she approved every order. In fact, she approved every order. The time that elapsed between when JENKINS first viewed and completed signing the orders and records was approximately 45 seconds. JENKINS could not, and did not, exercise any medical judgment in signing these orders. Included in this order were bilateral knee braces, suspension sleeves for the knee braces, and a back brace for beneficiary DH. Medicare was billed approximately $3,668.78 for these items and paid approximately $2,186.46.

As a result of JENKINS'S participation in the conspiracy, between approximately December 2018 and April 2020, various DME suppliers submitted approximately $7,854,337.97 in claims to Medicare, for which Medicare paid approximately $3,952,791.61.