# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAPHNE JENKINS,<br><br>      Defendant | Crim. No. 23-cr-10265 |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States submits its sentencing memorandum in support of its recommendation that the Court sentence the defendant, Daphne Jenkins, to a term of incarceration of 34 months with 12 months of supervised release and order restitution of $3,952,791.61, forfeiture of $44,020, and a special assessment of $100. This recommendation reflects a downward variance from the defendant's Guidelines range pursuant to the parties' plea agreement.

## BACKGROUND

### I. The Offense Conduct

Defendant Daphne Jenkins, a nurse practitioner, is one of many medical practitioners across the country to become involved with large scale telemedicine fraud schemes that have hemorrhaged monies from Medicare. These fraud schemes are created by marketers and durable medical equipment ("DME") companies, and they are executed by those companies, telemedicine companies, and, critically, medical providers—who essentially sell their signatures to create medical orders that DME companies can bill to Medicare.

The marketers solicit information from Medicare beneficiaries and create fabricated medical records and pre-prepared medical orders, often for medical braces. The marketers then

work with purported telemedicine companies, which find physicians and nurse practitioners willing to misstate that the braces are reasonable and medically necessary based on the practitioner's assessment of the beneficiary's individual physical condition—an assessment that never actually occurs. Often, the practitioner even lacks the ability to modify the information in the pre-populated records and order, including the diagnosis code and the items being ordered. The marketers sell these signed orders to DME companies pursuant to illegal kickback payments. The DME companies then submit claims to insurance companies—most often, Medicare—based on the items the medical practitioner ordered.

The signature of the licensed medical practitioner is critical; without it, DME companies would not purchase these orders and therefore would not submit claims for those items to Medicare.

This case arises from the defendant's work with a purported telemedicine company ("Telemedicine Company"). The defendant, a nurse practitioner licensed to practice in Virginia, the District of Columbia, and West Virginia, was an independent contractor nurse practitioner who, through a Massachusetts-based medical staffing company, was paid to purportedly evaluate orders for orthotic braces, such as back and knee braces, for Medicare beneficiaries on behalf of Telemedicine Company, and determine whether the braces were appropriate. PSR ¶¶ 10-11.

The records contained statements that Jenkins knew to be false, including that she had examined the beneficiary, that she had a provider-patient relationship with the beneficiary, and that she reviewed the records and orders and exercised medical judgment in signing the orders. *Id.* ¶ 11. Setting aside the falsehoods in the records, the records also contained insufficient and inadequate information to order orthotic braces. *Id.* ¶ 13. Nevertheless, Jenkins signed thousands

of orders, often without reading them. *Id.* ¶ 12. Jenkins knew this was not an appropriate way to practice medicine. *Id.*

For example, on or about December 11, 2018, Jenkins received a packet of medical records and orders for multiple orthotic braces for at least one beneficiary. *Id.* ¶ 16. The packet, sent via DocuSign, was 16 pages long and contained 12 places where Jenkins could sign if she approved every order. *Id.* In fact, she approved every order. *Id.* The time that elapsed between when Jenkins first viewed the records and when she completed all the signatures was approximately 32 seconds. *Id.* Jenkins could not, and did not, exercise any medical judgment in signing these orders. *Id.* Included in this packet were orders for bilateral ankle braces, a left wrist, and right shoulder brace for beneficiary TT. *Id.* Medicare was billed approximately $2,542.67 for these items and paid approximately $1,567.67. *Id.*

As another example, on or about January 8, 2020, Jenkins received a packet of medical records and orders for multiple orthotic braces for approximately seven beneficiaries. *Id.* ¶ 17. The packet, sent via DocuSign, was 37 pages long and contained 24 places where Jenkins could sign if she approved every order. *Id.* In fact, she approved every order. *Id.* The time that elapsed between when Jenkins first viewed the records and when she completed all the signatures was approximately 45 seconds. *Id.* Jenkins could not, and did not, exercise any medical judgment in signing these orders. *Id.* Included in this packet were orders for bilateral knee braces, suspension sleeves for the knee braces, and a back brace for beneficiary DH. *Id.* Medicare was billed approximately $3,668.78 for these items and paid approximately $2,186.46. *Id.*

In exchange for signing these documents, the defendant was paid $20 per consult. *Id.* ¶ 14. These payments to the defendant were kickbacks to induce her to sign orders for orthotic braces regardless of medical necessity, in the absence of a preexisting provider-patient

3

relationship, and without a physical examination. DME companies purchased these signed orders, and submitted claims based on these orders.

Had Medicare known that the orders were procured because of kickbacks, contained false statements, and were signed regardless of medical necessity, Medicare would not have paid these claims.

The defendant facilitated these fraudulent orders by signing medical records that set forth the results of physical examinations she had not conducted, contained information from conversations she did not have, and certified a finding of medical necessity she had not made.

As a result of the defendant signing approximately 2,200 brace orders without ever performing an assessment of the beneficiaries, appropriately determining medical necessity, or having any interaction at all with these beneficiaries, Medicare paid DME companies almost $4 million. *Id.* ¶ 18.

## II. Procedural History

On October 6, 2023, the United States filed an information charging Jenkins with one count of Conspiracy to Commit Health Care Fraud pursuant to 18 U.S.C. § 1349. Dkt. No. 1. On November 27, 2023, Jenkins pleaded guilty to the information, pursuant to a Rule 11 plea agreement. Dkt. No. 8.

## SENTENCING GUIDELINES

In determining a defendant's sentence, the court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the court should consider the various factors set forth in 18 U.S.C. § 3553(a). Only after

consideration of those factors should the court reach its ultimate determination. *See United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).

In the Presentence Investigation Report ("PSR"), the Probation Department calculated Jenkins' offense level as follows:

- Base offense level of 6, U.S.S.G. § 2B1.1(a)(2);

- 18 levels are added because the defendant's intended loss was more than $3,500,000 and less than $9,500,000, U.S.S.G. § 2B1.1(b)(1)(J);

- 2 levels are added because the offense is a Federal health care offense involving a Government health care program and the loss was more than $1,000,000, U.S.S.G. § 2B1.1(b)(7)(B)(i);

- 2 levels are added because Jenkins abused a position of trust in a manner that significantly facilitated the commission of the offense, U.S.S.G. § 3B1.3;

- 3 levels are deducted based on Jenkins' acceptance of responsibility, U.S.S.G. § 3E1.1; and

- 2 levels are deducted because Jenkins has no criminal history points and otherwise meets the criteria to be considered a Zero-Point Offender, U.S.S.G. § 4C1.1(a) and (b).

PSR ¶¶ 23-33. The resulting total offense level is 23. *Id.* ¶ 33. Combined with a criminal history category I, the Probation Department concluded that Jenkins' Guidelines range is 46 to 57 months. *Id.* ¶ 69. The United States agrees with the Probation Department that this is the applicable Guidelines range.

## **SENTENCING FACTORS**

In weighing the § 3553(a) factors, the First Circuit has emphasized that an individualized determination is, at all times, the touchstone: while a deviation from the guidelines may be warranted in certain instances; in other instances, it will not be. *See Martin*, 520 F.3d at 91. The factors in 18 U.S.C. § 3553(a) support a sentence of imprisonment of 34 months, which is a downward variance from the lower end of the defendant's Guidelines range.

# I. The Nature and Circumstances of Jenkins' Offense

A custodial sentence below the advisory Guidelines' recommended sentence is appropriate considering the nature and circumstances of this offense. The defendant was not by any means the ringleader of the fraud, and the unlawful proceeds that flowed to her were a small part of the whole. Her conduct is nonetheless serious: by her participation in the scheme, she abused her position as a Medicare-enrolled health care provider, abdicated her responsibility as a medical professional, and enabled the Telemedicine Company, marketing companies, and DME companies to defraud the Medicare program for the sake of personal financial gain.

The defendant is a highly experienced medical professional who worked steadily as a nurse practitioner for over 15 years and as a registered nurse for over 15 additional years prior to the conduct at issue. PSR ¶¶ 55-62. Her extensive experience—not only in the medical field, but as a Medicare-enrolled provider—limits any possible justification or excuse for the defendant's involvement in this scheme. The defendant knew better than to engage in this illegal conduct and understood the damage that her actions could, and did, inflict on Medicare. In all, her conduct cost the Medicare program almost $4 million, rendering those funds unavailable to provide care for other beneficiaries who truly needed it.

The defendant's conduct also constitutes a serious breach of the trust that the American public has placed in her as a Medicare-enrolled provider. The Medicare program is an entirely "trust-based system," meaning that "Medicare does not verify that procedures were actually performed by, for example, cross-referencing claims with medical records, but rather it relies on the representations of the medical professionals that each claim submitted was performed as billed." *United States v. Ahmed*, No. 14-cr-277, 2017 WL 3149336, at *2 (E.D.N.Y. July 25, 2017). Medicare trusted the defendant to conduct herself in an honest and ethical manner, and she broke that trust by turning to fraud to line her pockets.

But the harm in this case went beyond the financial losses to Medicare. Elderly and vulnerable Medicare beneficiaries were deprived of appropriate medical care by a practitioner who exercised professional judgment based on each beneficiary's individual medical situation. Instead, the defendant prescribed braces whether or not they were medically necessary or even appropriate for the beneficiaries' particular medical condition. Nor were the beneficiaries given any instruction on how to use the braces or offered follow-up examinations to ensure that the braces were being worn correctly and were not causing injury, which a practitioner providing genuine medical care would have done. Medicare beneficiaries rely on health care providers to act in their best interests. Instead, Jenkins acted in her own best interests.

**II.     Jenkins' History and Characteristics**

The government acknowledges that Jenkins has no prior criminal history and plays a significant role as a caretaker for her mother and adult niece, both of whom have serious medical issues. In addition, when the government confronted the defendant with the evidence that she falsified records by signing the pre-prepared orders and cookie-cutter medical records in no time at all, she acknowledged her wrongdoing and agreed to enter a timely plea.

However, Jenkins' education, long work history, and experience cut in the opposite direction: Jenkins knew it was wrong to sign medical orders that contained false statements, falsely portrayed her as providing medical care, and to order medical products for beneficiaries with whom she never interacted. Unlike many other defendants before the Court, Jenkins had a stable, safe childhood, PSR ¶ 43; obtained a professional degree, *id.* ¶ 55; and had an opportunity to use her skills and education to make an honest living. She disregarded those advantages to play a role in a scheme that enabled her to make money with little effort on her end. Moreover, the defendant's conduct was not a single failure of judgment or momentary ethical lapse. Rather,

the defendant's conduct involved repeated, deliberate decisions—choices she made over an extended period that required lucidity and deliberation.

### III. The Need to Reflect the Seriousness of the Offense, to Afford Adequate Deterrence, and to Protect the Public from Further Crimes of the Defendant

The sentence imposed here must reflect the seriousness of the defendant's offense. The fraud in which the defendant participated targeted national programs relied on by millions of Americans, which has very real implications for individual lives. Congress aptly summarized the effects of health care fraud over thirty-five years ago:

> In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. Rep. 95-393, pt. II, at 44 (1977); *see also* H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures." (quotation and citation omitted)).

These concerns are just as pressing today as they were then, which is why Congress has enacted increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines to punish health care fraud more severely).

The defendant participated in and enabled a conspiracy to swindle Medicare into paying DME companies approximately $4 million for orthotic braces that were medically unnecessary,

8

tainted by kickbacks, and based on false documentation. She entered into the conspiracy knowingly and voluntarily—prescribing braces in a manner she knew to be inconsistent with her professional obligations and the Medicare beneficiaries' best interests—and created false medical records in order to justify and cover up the fraud.

To be sure, the defendant is not as culpable as the Telemedicine Company owner and certain other co-conspirators. Nonetheless, she was a gatekeeper of the fraud: the Telemedicine Company needed prescribing practitioners to function and would have collapsed without the willing involvement of the defendant and other practitioners. A custodial sentence is required to reflect the seriousness of the defendant's conduct, to promote respect for the law and federally funded programs like Medicare, and to adequately punish the defendant for the calculated steps she took to participate in the fraudulent scheme.

While the government believes that specific deterrence is not an issue here, the Court's sentence should further the aim of general deterrence. 18 U.S.C. § 3553(a)(2)(B). As courts have recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." *United States v. Johnson*, No. 16-cr-457-1, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (citation omitted); *see United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983)) ("Congress viewed [general] deterrence as 'particularly important in the area of white collar crime.'"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence" (internal quotation marks and citation omitted). *Martin*, 455 F.3d at 1240; *see also Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) ("Since deterrent effect depends not only upon

9

the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").

The need to promote general deterrence is particularly acute in cases where a government insurance program is the victim of the fraud. Fraud against Medicare diverts scarce resources from the elderly and disabled. Moreover, it undermines society's faith in the effectiveness of Medicare. The deterrent effect of an incarceratory sentence in this case would therefore be particularly valuable, as it would drive home to medical practitioners the risk of participating in this type of scheme. Because licensed professionals are integral to the operation of such schemes, deterring them removes a critical and irreplaceable resource for would-be health care fraudsters.

## IV. Restitution and Forfeiture

In accordance with the Mandatory Victim Restitution Act and the parties' plea agreement, the government respectfully submits that the Court should order the defendant to pay restitution to the Medicare program in the amount of $3,952,791.61, which reflects the approximate amount that Medicare paid resulting from defendant's conduct. *See* 18 U.S.C. § 3663A; PSR ¶¶ 18, 80.[1]

In the parties' plea agreement, the defendant agreed to pay forfeiture in the amount of $44,020.00, which reflects the defendant's proceeds from the conspiracy, as required by 18 U.S.C. § 982(a)(7). PSR ¶ 14. Accordingly, the government respectfully submits that the Court should incorporate the January 5, 2024 order of forfeiture signed by the Court into the judgment of conviction.

---

[1] Paragraph 80 of the PSR appears to contain a typo, listing the restitution amount as $3,952,7**6**1.61 instead of $3,952,7**9**1.61, as set forth in the plea agreement and earlier in paragraph 18 of the PSR.

## RECOMMENDATION

Based on the factors set forth above, the United States recommends that the Court downwardly vary from the low end of the Guidelines of 46 months and impose a term of incarceration of 34 months. The government's recommendation is sufficient—but no greater than necessary—to meet the goals of sentencing.

<pre>
                                Respectfully submitted,

                                JOSHUA S. LEVY
                                Acting United States Attorney

                          By:   /s/ Howard Locker
                                HOWARD LOCKER
                                ALEXANDRA BRAZIER
                                LAUREN GRABER
                                LINDSEY ROSS
                                Assistant United States Attorneys
                                (617) 748-3638
</pre>

# CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                                */s/ Howard Locker*
                                                Howard Locker
                                                Assistant United States Attorney

Date: April 5, 2024